IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCIS R. HOLLEY, #168438     *
        Plaintiff,
     v.     *    CIVIL ACTION NO. RWT-10-2931

NURSE KOJO     *
NURSE TOLA
DOCTOR YU     *
PSYCHOLOGY DEPARTMENT
CORRECTIONAL MEDICAL SERVICE     *
        Defendants.
                          ***

**MEMORANDUM OPINION**

Pending before the Court is the unopposed Motion to Dismiss or, in the Alternative, for Summary Judgment filed by Defendants Kojo (Nurse Kwadwo Amokako), Tola (Nurse Practitioner Tolani Toyinbo),[1] and Correctional Medical Services, Inc. ("CMS"). ECF No. 15. Although Plaintiff was advised of his right to file a response in opposition to Defendants' motion, and the consequences of failing to do so, Plaintiff has filed nothing further in this case. See ECF No. 16. The undersigned has examined the medical records and declaration and finds that no hearing is necessary. See Local Rule 105.6. (D. Md. 2010). For the reasons that follow, Defendants' motion, construed as a motion for summary judgment, shall be granted.

**Background**

In a civil rights Complaint filed on or about October 15, 2010, Plaintiff asserts claims against Nurse Kojo, Nurse Tola, Doctor Yu, the Psychology Department at the Jessup Correctional Institution, and CMS, related to the treatment he received for sudden paralysis to his lower

---
[1] The Clerk shall amend the docket to reflect the correct names of Amoako and Toyinbo.

1

extremities occurring on October 10, 2007.[2] Plaintiff claims that he received forced medication injections, was "supposedly" diagnosed with Parkinson's disease, and was denied therapy for his legs, back, and hands. He seeks damages in the amount of $25,000,000.

Medical records submitted by Defendants in support of their Motion for Summary Judgment reflect that, prior to October of 2007, Plaintiff was diagnosed and treated for various medical maladies and mental health issues such as pneumonia, pulmonary embolus, symptoms of parkinsonism,[3] catatonia,[4] decubitus ulcers ("DU") or bedsores, schizophrenia, and rhabdomyolysis.[5] He was twice admitted to the University of Maryland Medical System ("UMMS") to treat his conditions and to rule out a physical cause of his claim of lower extremity paralysis. Plaintiff was repeatedly housed at the Jessup Correctional Institution ("JCI") Infirmary and the Correctional Mental Health Center in Jessup for observation of his conditions and his repeated refusal to eat, hydrate, and take his medications. Discussions were entered to transfer him to Clifton T. Perkins State Hospital Center, a state-run psychiatric hospital, but the hospital refused to accept him because of his medical instability.

During the month of October 2007, Plaintiff was bedridden but able to move his arms and legs and to use a urinal and bedside commode. He continued to refuse his medications at times and

---

[2] Although service was never effected on Dr. Yu or the Psychology Department, the Complaint contains no specific allegations of wrongdoing by Dr. Yu and both Defendants would be entitled to summary judgment for reasons apparent herein.

[3] Parkinsonism is a neurological syndrome characterized by tremor, hypokinesia, rigidity and postural instability, most commonly caused by Parkinson's disease.

[4] Catatonia is a state of apparent unresponsiveness to external stimuli that may be caused by a variety of neurological psychiatric, psychological or medical conditions. In its most well-known form it involves a rigid, immobile position that is held by a person for a considerable length of time.

[5] Rhabdomyolysis is the breakdown of muscle fibers resulting in the release of muscle fiber contents into the bloodstream. Some of the fibers are harmful to the kidney and frequently result in kidney damage.

said his food was being poisoned. Plaintiff was transferred to the Laurel Regional Hospital ("LRH") for further evaluation and treatment of lethargy, hypotension (low blood pressure), hypoxia (deprivation of adequate oxygen supply), and fever. He was treated with intravenous ("IV") fluids and antibiotics for a possible infection. He was discharged to the JCI Infirmary on October 23, 2007. He continued to run a low-grade fever and on November 2, 2007, underwent a bone scan to determine if he had osteomyelitis ("OM") or acute or chronic bone infection. The scan showed evidence of OM within the left hip bone and he was treated with the IV antibiotics Vancomycin and Zosyn. At that time, prison medical staff was concerned about the risk of embolisms traveling to the lungs due to Plaintiff's inability or refusal to walk or exercise his legs. He refused to allow staff to administer the anticoagulant Heparin. Further, due to inactivity, Plaintiff developed contractures[6] in his legs.

On December 3, 2007, Dr. Gedion Atnafu, a psychiatrist, submitted a request for medical parole stating that Plaintiff required "complete" care due to his Parkinsonism and schizophrenia. He noted that Plaintiff was becoming increasingly paranoid since refusing his anti-psychotic medication as of November 23, 2007.

Plaintiff's medical condition continued without improvement. On March 20, 2008, he was admitted to Johns Hopkins Hospital ("JHH") for evaluation of his parkinsonism symptoms and spasticity. A JHH physician, Dr. Paul Dash, believed that Plaintiff's upper extremity tremors were caused by Parkinson's disease, but Dash could not explain Plaintiff's leg paralysis. Dash recommended that Plaintiff take Sinemet to treat his parkinsonism symptoms.

---

[6] Contracture is a tightening of the muscle, tendons, ligaments, or skin that prevents normal movement.

On July 30, 2008, Plaintiff was admitted to UMMS for insertion of a percutaneous endoscopic gastrostomy ("PEG") tube because he was not getting enough nutrition by mouth. On September 3, 2008, he was admitted to Bon Secours Hospital ("BSH") for treatment of a Methicillin-resistant Staphylococcus infection of his sacral DU. He underwent excision and debridement (dead tissue removal) of the DU and was discharged from BSH on September 8, 2008.

On January 9, 2009, Plaintiff underwent an orthopedic surgery consultation for correction of the contractures of his legs at BSH. The orthopedic surgeon recommended a neurology consultation prior to correcting Plaintiff's contractures. On February 19, 2009, Plaintiff was seen by Dr. Harjit Bajaj, a neurologist, who concluded that Plaintiff's parkinsonism symptoms were caused by either Parkinson's disease or antipsychotic medications. Bajaj recommended Sinemet and a head CT or MRI to rule out any brain abnormality. On May 7, 2009, Plaintiff again saw Bajaj who noted improvement and recommended increasing the Sinemet dosage. Bajaj opined that Plaintiff's symptoms could be managed with medication but would never go away, and doubted that tendon release surgery would significantly help Plaintiff.

On December 3, 2009, Plaintiff underwent a barium swallow test to determine if he had the ability to swallow and the potential danger of aspiration. The results showed that Plaintiff would be able to take in thin liquids and a mechanical soft diet without aspirating if he was sitting upright, ate slowly, swallowed several times for each mouthful, and remained upright for 30 minutes after meals.

On February 26, 2010, Dr. Lawrence Scipio, a BSH urologist, evaluated Plaintiff for recurrent urinary tract infections ("UTI"). Dr. Scipio noted that Plaintiff had been refusing antibiotics, but now wanted his choice of antibiotics. It was noted that Plaintiff's urine was slightly cloudy and a sample was taken for culture and sensitivity testing. Plaintiff was again evaluated on

4

March 26, 2010 and Scipio recommended that Plaintiff be given the antibiotic tetracycline to treat his UTI. Plaintiff refused a further urology follow up.

In May of 2010, Plaintiff's PEG was removed because he was eating and drinking on his own. In August of 2010, however, he refused to eat or take his Sinemet. On August 23, 2010, his mental health status changed and he developed low blood sugar levels. Plaintiff was admitted to the LRH emergency department that same date, admitted, and given IV fluids, peripheral parenteral nutrition ("PPN") (a nutritional formula), and Sinemet. Plaintiff was seen by a psychiatrist who found that he was unable to make medical decisions for himself. Plaintiff was discharged to the Jessup Regional Institution ("JRI") on or about August 31, 2010.

On August 31, 2010, Dr. Sisay evaluated Plaintiff. Plaintiff first refused to talk to Sisay; later he asked Sisay if he was receiving a "euthanasia" shot. Sisay tried to alleviate Plaintiff's fears, continued him on PPN, and advised the nurses to offer him Sinemet. Two psychiatrists determined that Plaintiff was not competent to make medical decisions. Sisay contacted Plaintiff's son to discuss guardianship. On September 13, 2010, Plaintiff's PPN was discontinued when he began to eat again.

On December 27, 2010, Sisay again evaluated Plaintiff after he stopped eating. Sisay contacted the prison's psychiatric department for an emergency evaluation. Plaintiff was transferred to the emergency department of LRH. On December 29, 2010, he was transferred from LRH to BSH to rule out any underlying medical problems. While at BSH, Plaintiff was tested and physicians determined that Plaintiff had erosive esophagitis, gastritis, and ulcers of the stomach and portions of the small intestine. Physicians at BSH contacted Plaintiff's son who gave permission for endoscopy and insertion of a new PEG tube for the administration of fluids and nutrition to Plaintiff. On January 6, 2011, Plaintiff was discharged from BSH and sent to JRI.

Sisay continued to follow Plaintiff's progression at JRI. When Plaintiff agreed to eat, the PEG tube feeding was removed and flushed with water in the event that reinsertion became necessary. JRI's on-site psychiatrist believes that although Plaintiff's mental health condition has improved, he is not competent to make medical decisions for himself. Sisay has been unable to reach Plaintiff's son to make guardianship arrangements.

On or about February 4, 2011, Plaintiff was transferred to the Western Correctional Institution ("WCI") in Cumberland, Maryland. Dr. Joubert renewed his medications, ordered DU care, continued Plaintiff's urinary catheter, ordered that Plaintiff's PEG tube be flushed twice a day with water to keep it open, directed that Plaintiff be moved out of his bed and into a chair as much as possible, and submitted a consultation report for physical therapy evaluation and treatment. ECF No. 15, Ex. B. By March 5, 2011, Plaintiff was again refusing his medications and had a decreased food intake. On March 11, 2011, his mental status began to deteriorate and he developed a UTI. Plaintiff was transferred to BSH for treatment. Joubert affirms that medical staff will continue to treat Plaintiff.

**Standard of Review**

The Court must grant summary judgment to a moving party if it determines that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 302 (4th Cir. 2006); Fed. R. Civ. P. 56. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." F. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly

6

address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." In assessing whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." F. R. Civ. P. 56(c)(3).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F. 3d 630, 633 (4th Cir. 2003) citing Wilson v. Seiter, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. Farmer, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." Rich v. Bruce, 129 F. 3d

336, 340, n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Virginia Beach Correctional Center, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." Farmer, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2000) (citing Liebe v. Norton, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Inmates do not have a constitutional right to the treatment of their choice, Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury. See Estelle, 429 U.S. at 105-06; Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); see also Fleming v. LeFevere, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

It is undisputed that Plaintiff has multiple medical and psychiatric problems. However, medical records submitted by Defendants in support of their Motion for Summary Judgment reflect that Plaintiff has been evaluated and treated for those concerns by on-site prison healthcare staff and personnel at UMMS, JHH, LRH, and BSH. Plaintiff has also received care at local prison hospital centers. Plaintiff offers no opposition to the evidence presented. The undisputed evidence

establishes that Plaintiff received constitutionally adequate medical care.[7]  Thus, Defendants are entitled to summary judgment on all claims.

A separate Order follows.

Date: May 18, 2011                                             /s/
                                                      ROGER W. TITUS
                                              UNITED STATES DISTRICT JUDGE

---

[7] To the extent Plaintiff seeks to hold Defendant CMS liable on a theory of vicarious liability, the Fourth Circuit has made clear that the doctrine of respondeat superior does not apply to 42 U.S.C. § 1983 claims.  See Austin v. Paramount Parks, Inc., 195 F.3d 715, 727-28 (4th Cir. 1999); Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982).